IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 1:17-cr-00005 |
| | ) | JUDGE RICHARDSON |
| DARRYL WAYNE PIGG | ) | |
| | ) | |

# **MEMORANDUM OPINION**

Pending before the Court is Defendant's Motion to Suppress (Doc. No. 30). The Government filed a response (Doc. No. 32). On November 15, 2018, the Court held an evidentiary hearing on the motion. Thereafter, the Government and Defendant filed post-hearing briefs (Doc. No. 45; Doc No. 47). For the reasons discussed below, Defendant's Motion to Suppress will be denied.

## **FACTUAL FINDINGS**[1]

In the late afternoon of February 17, 2017, a confidential informant informed Officer Seagroves of the Columbia Police Department ("CPD") that Defendant could be found at the Big Wash Tub Laundromat in Columbia, Tennessee, and Defendant was in possession of a large quantity of methamphetamine and cash. (Doc. No. 42 at 17:20-25). The confidential informant also advised Officer Seagroves that Defendant was driving a white jeep. (*Id*. at 20:14-19). Between 5:00 p.m. and 5:30 p.m., Officer Seagroves shared this information with Sergeant John Ussery of

---

[1] The Court makes these factual findings based on the cited testimony from the suppression hearing (as set forth in the hearing transcript, Doc. No. 42). In relying on specific cited testimony in this memorandum opinion, the Court has determined that it is credible for one or more reasons, including, for example, that it was delivered by the witness in a credible manner, was uncontradicted by any other evidence, was not successful impeached, is inherently uncontroversial or otherwise believable, and/or was supported at least generally by other evidence.

CPD. (*Id*. at 17:14-17). Sergeant Ussery also was aware that there was a pending, drug-related warrant for Defendant's arrest stemming from an incident in 2014. (*Id*. at 17:24-25; 18:15-22).

Thereafter, Sergeant Ussery and Special Agent Babiarz of the Bureau of Alcohol, Firearms, Tobacco, and Explosives drove to the Big Wash Tub,[2] which is about three or four miles from the Columbia Police Station, in an unmarked government vehicle. (*Id*. at 17:5-7; 20:3-6). As they drove through the parking lot, they observed a parked white Jeep with a male individual sitting in the driver's seat. (*Id*. at 20:22-21:17; 99:6-11). At that time, Sergeant Ussery and Special Agent Babiarz suspected that the male was in fact Defendant, *id.* at 99:6-11, but they could not confirm this because they did not yet know what Defendant looked like. (*Id.* at 18:25-19:2; 106:24-107:3). Later, they were able to identify Defendant as the male that had been sitting in the Jeep.[3] The Jeep matched the color, make, and model of the information provided by the confidential informant. (*Id*. at 20:14-19). Sergeant Ussery drove out of sight of Defendant and requested uniformed backup. (*Id*. at 21:20-23). Officer Sheppard of CPD arrived on the scene in a marked patrol car around five minutes later. (*Id*. at 24:6-12). Sergeant Ussery updated Officer Sheppard on the

---

[2] Apparently, the two men rode together, with Sergeant Ussery driving. (Doc. No. 42 at 7:4-13).

[3] On direct examination at the suppression hearing, Sergeant Ussery and Special Agent Babiarz each identified the Defendant—both by his name and by pointing him out in the courtroom—as the male sitting in the Jeep. (Doc. No. 42 at 20:22-21:11; 100:2-9). Likewise, on cross-examination, each answered in the affirmative when asked whether he had seen "Pigg"—*i.e.*, Darryl Pigg, the Defendant in this case—sitting in the Jeep. (*Id*. at 52:17-19; 106:24-107:4). In addition, their respective written reports of the incident each state that the two men observed "Pigg"—*i.e.*, Darryl Pigg, the Defendant in this case—in the Jeep. (Def. Ex. 1; Def. Ex. 7). Since neither man had seen Defendant, Darryl Pigg, prior to driving by and seeing him in the Jeep, (Doc. No. 42 at 52:24-25; 107:1-4), the identification of the person in the Jeep as Defendant, Darryl Pigg, must have been based on something other than a mental comparison of the appearance of the male seen in the Jeep with their prior perception of the appearance of Defendant, Darryl Pigg. The most likely basis for equating the person seen in the Jeep with Defendant, Darryl Pigg, would be a perception that the male seen in the Jeep was the person seen inside the laundromat, who was eventually identified to be Darryl Pigg, the Defendant in this case. For this reason, the Court construes the evidence to indicate that Sergeant Ussery and Special Agent Babiarz, while in the laundromat, identified to their satisfaction Darryl Pigg as the male who had been sitting in the Jeep. It is true that the record is not 100 percent clear on this point, but it is the most reasonable construction of the evidence, and a construction that Defendant did not, and did not even attempt to, undermine on cross-examination of these two witnesses.

situation, and then they drove their respective cars around the laundromat and parked close to where the Jeep was parked. (*Id*. at 22:21-23:6; 100:20-101:5).

Defendant was no longer inside the Jeep. (*Id*. at 23:7-17; 101:2-3). Believing Defendant was in the laundromat, the three officers entered the Big Wash Tub and observed Defendant taking clothes out of a dryer. (*Id*. at 23:18-24:3). The officers approached Defendant, and Officer Shepard asked him to identify himself. (*Id*. at 24:4-9; 101:16-102:1). Defendant did not produce any identification and stated his name was Mark Brown. (*Id*. at 24:10-22; 101:16-102:1). Officer Sheppard asked Defendant his date of birth once and then again soon thereafter; each time, Defendant responded with a date, but the two dates did not match. (*Id*. at 25:1-8; 101:16-102:1). The officers then arrested Defendant for criminal impersonation and placed him in handcuffs inside the Big Wash Tub. (*Id*. at 25:20-26:9; 102:4-5). The officers searched Defendant incident to his arrest and found a glass pipe, a baggie containing 5.5 grams of methamphetamines, and a car key in Defendant's pocket. (*Id*. at 26:16-27:9; 102:6-10). Defendant was then placed in the back of Officer Sheppard's patrol car. (*Id*. at 27:10-12; 102:11-16).

Sergeant Ussery called Officer Hull, the department's canine officer, as well as the special response team, to assist. (*Id*. at 27:13-28:6). When Officer Hull arrived, he ran his canine around the Jeep and the canine did not alert. (*Id*. at 60:15-22). Officer Hull stowed his canine and then walked around the Jeep looking through the closed windows into the interior of the Jeep. (*Id*. at 61:13-18). Through the Jeep window, Officer Hull observed a handgun between the console and driver's seat, and ammunition on the driver's side floor. (*Id*. at 61:22-62:8; 78:12-80:16).

Officer Hull then went to speak with Defendant, who was still sitting in the back of Officer Sheppard's patrol car. (*Id*. at 63:1-5). Officer Hull issued *Miranda* warnings and Defendant stated he understood his rights. (*Id*. at 63:6-64:4). Officer Hull then asked Defendant whether he was a

convicted felon, and Defendant responded that he was. (*Id*. at 64:5-8). When asked who owned the vehicle, which had temporary registration tags, Defendant stated it belonged to Laquita Bosheers. (*Id*. at 64:11-16). The officers were unable to contact Ms. Bosheers; however, they did contact the car dealer from which the Jeep was purchased, and the dealer confirmed the Jeep was registered to Ms. Bosheers. (*Id*. at 71:4-23).

Sergeant Adams arrived on the scene. (*Id*. at 78:12-80:16). He too saw the handgun and ammunition through the closed Jeep window. (*Id*.). He approached Defendant, still seated in the back of the patrol car, and advised Defendant of his *Miranda* rights. (*Id*. at 81:22-82:3). Defendant informed Sergeant Adams that he had been dropped off at the Big Wash Tub by a female friend named Annie. (*Id*. at 82:4-10). He also stated that Ms. Bosheers gave him the Jeep key so he could sit in the vehicle while he did his laundry. (*Id*.). Sergeant Adams brought up the fact that the laundromat had security cameras generating footage that could be reviewed, and asked whether the footage would show Defendant arrive or be present in the Jeep. (*Id*. at 84:19-84:25). At this juncture, Defendant stated he wished to speak to an attorney. (*Id*. at 84:25-85:1). Confirming that Defendant was invoking his *Miranda* rights, Sergeant Adams immediately ended the conversation. (*Id*. at 85:2-5).

A short time later, Defendant indicated he wished to speak to Sergeant Adams again. (*Id*. at 85:12-19). Sergeant Adams returned to the patrol car and reminded Defendant that he had invoked his *Miranda* rights, but Defendant responded that he still wished to speak with Sergeant Adams. (*Id*.) Defendant informed Sergeant Adams that he wished to avoid any charges and began giving information relating to key sources of methamphetamine dealers in the area. (*Id*. at 85:22-86:4). Sergeant Adams told Defendant he was not the person who could help him with that

information and nothing Defendant said would prevent him from going to jail that night. (*Id*. at 85:22-86:25). Defendant then informed Sergeant Adams he had nothing further to say. (*Id*).

Prior to invoking his *Miranda* rights the first time when speaking with Sergeant Adams, Defendant refused to give his consent to search the Jeep. (*Id*. at 42:19-20). He stated that the Jeep belonged to Ms. Bosheers, whom was shopping nearby, and that he was merely holding the Jeep key in case he wanted to sit in it. (*Id*. at 42:21-43:5). Sergeant Ussery, who had left to participate in another operation (in an unrelated case), returned to the scene and informed the other officers that he and Special Agent Babiarz saw Defendant sitting in the Jeep prior to his arrest. (*Id*. at 73:19-25; 94:15-24). The Jeep was then searched without a warrant. (*Id*. at 85:6-8). The search revealed a loaded .357 Ruger, several ounces of methamphetamine, around $10,000 in cash, a notebook with names and phone numbers, Defendant's Department of Corrections identification, several forged Georgia driver's licenses bearing Defendant's name and photo, a small amount of marijuana, and what appeared to be meth-making materials. (*Id*. at Gov. Ex. 4-8).

After the search, Defendant was taken to the police station, where he signed and dated a document titled "Admonition of Miranda Rights." (*Id*. at 104:5-105:23; 107:13-23; Gov. Ex. 1b; Def. Ex. 12). Defendant then made admissions regarding his possession of the drugs in the Jeep and regarding his involvement in drug trafficking . (*Id*. at 106:4-9).

## ANALYSIS

### I.      Probable Cause Existed to Arrest Defendant

A warrantless arrest that is supported by probable cause does not violate the Fourth Amendment. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists where the facts, at the time of the arrest, were sufficient to lead a prudent person to believe that a crime had been committed or was in the process of being committed." *United States v. Jimenez*, 654 F. App'x

815, 819 (6th Cir. 2016) (citing *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). Whether probable cause exists "depends on the reasonable conclusions 'drawn from the facts known to the arresting officer at the time of the arrest.'" *Id.* (citing *Devenpeck*, 543 U.S. at 152).

The officers arrested Defendant for the crime of criminal impersonation. Tennessee law defines the crime of criminal impersonation as "an offense against administration of government" and provides: "A person commits criminal impersonation who, with intent to injure or defraud another person . . . [a]ssumes a false identity . . . ." Tenn. Code Ann. § 39-16-301(a)(1). "To establish the offense of criminal impersonation, the state is not required to show proof of why the defendant sought to defraud law enforcement, only that he intended to misrepresent his true identity." *State v. Brooks*, 909 S.W.2d 854, 859 (Tenn. Crim. App. 1995); *see also State v. Bell*, No. 01C01-9807-CR-00279, 1999 WL 332517, at *4 (Tenn. Crim. App. May 26, 1999) (finding evidence that the defendant supplied law enforcement with a false name sufficient to permit the jury to convict the defendant of criminal impersonation).

Defendant argues (in his post-hearing brief, though not before) that his arrest for criminal impersonation was unconstitutional because it was not supported by probable cause. (Doc. No. 47 at 7-8). Specifically, he argues that the officer's realization that Defendant gave two different birthdates during the initial conversation, combined with the officer's "gut feeling" that Defendant was not truthful, is not enough to support probable cause for Defendant's arrest. (*Id.*).

However, Defendant's argument ignores other facts that existed at the time of the arrest that in the Court's view could "lead a prudent person to believe that a crime had been committed[.]" *Jimenez*, 654 F. App'x at 819 (citing *Klein*, 275 F.3d at 550). In particular, the facts as a whole at the time of arrest established probable cause that the person arrested (Defendant) had committed criminal impersonation by assuming the false identity of "Mark Brown" (complete with a bogus

birthdate) when in fact the person was Darryl Pigg (Defendant).[4] When the officers first approached Defendant he informed officers that his name was Mark Brown. Prior to approaching Defendant in the Big Wash Tub, the officers knew that a confidential informant had informed Officer Seagroves that Defendant would be sitting in a white Jeep outside of the Big Wash Tub. When Sergeant Ussery and Special Agent Babiarz arrived at the Big Wash Tub, they observed a male individual sitting in a white Jeep in the parking lot. Thus, their observation corroborated the confidential informant's tip that the male individual sitting in the Jeep was Defendant. *See United States v. Cooper*, 1 F. App'x 399, 403 (6th Cir. 2001) ("An informant's tip, by itself, can suffice to create probable cause [to arrest] if the tip appears reliable under the totality of circumstances."); *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (explaining that a confidential informant's tip that was corroborated by officers can support probable cause).

Moreover, during the encounter, Defendant gave two different answers when asked his date of birth and the officers believed that Defendant's behavior and mannerisms were evasive. *See United States v. Cottman*, 497 F. Supp. 2d 598, 603 (D. Del. 2007) (finding probable cause for the crime of criminal impersonation, under Delaware law, where the defendant displayed deceptive behavior regarding his identity (*i.e.*, did not present any identification; gave false name and birthdate, and attempted to conceal actual identification card)). Further, the officers knew there was a warrant out for Defendant's arrest, which would give him reason to not inform the officers of his real name. The Court finds that a practical, common sense review of the facts available to

---

[4] The Court believes that the Government's theory as to criminal impersonation is a little unclear. Specifically, the Court cannot discern whether the Government is justifying its arrest of Defendant: (a) based on alleged probable cause that the person arrested was falsely claiming to be a "Mark Brown" when in fact the person was not "Mark Brown," irrespective of whether the person arrested was in fact Darryl Pigg in particular; or (b) based on alleged probable cause that the person arrested was falsely claiming to be someone ("Mark Brown," as it happens) other than Darryl Pigg when in fact the person was Darryl Pigg in particular. There is a distinction with a difference here. It is one thing to have probable cause to believe that someone is *not* "Mark Brown" (whether or not he is Darryl Pigg), and it is another (additional) thing to have probable cause to believe that someone *is* Darryl Pigg. (while claiming to be "Mark Brown"). In the Court's view, the Government objectively had probable cause to believe not just the former, but also the latter.

7

the officers at the time of Defendant's arrest would warrant a prudent person to "reasonably conclude" that Defendant was misrepresenting his true identity; therefore, giving rise to probable cause for the crime of Defendant's arrest. *Jimenez,* 654 F. App'x at 819 (citing *Klein*, 275 F.3d at 550).[5]

## II. The Warrantless Search of the Jeep was Lawful

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Warrantless searches are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation marks omitted). Defendant argues that the warrantless search of the Jeep was unlawful, thus requiring suppression of the fruits of the search (*i.e.*, a loaded .357 Ruger, several ounces of methamphetamine, around $10,000 in cash, a notebook with names and phone numbers, Defendants' Department of Corrections identification, several forged Georgia driver's licenses bearing Defendant's name and photo, a small amount of marijuana, and what appeared to be meth-making materials). The Government argues that a warrant was not required, because circumstances supporting two separate exceptions to the warrant requirement existed: (1) the existence of probable cause to believe that there was, inside of the vehicle, evidence of a drug crime and a felon-in-possession-of-a-firearm crime; and (2) a lawful search of an automobile incident to arrest. The applicability of each exception—generally known as the "automobile

---

[5] Given the Court's resolution of this issue, the Court declines to address the Government's argument that Defendant was lawfully arrested based on a valid pre-existing warrant. The Court notes that at the suppression hearing, Government witnesses did not describe Defendant's initial arrest as being based on the warrant; instead, the sole subjective justification they invoked was probable cause (without an accompanying warrant) for the offense of criminal impersonation. Whether the arrest is objectively, in retrospect, properly justified by the pre-existing warrant is an issue the Court need not reach.

8

exception" and "search [of an automobile] incident to arrest," respectively—will be explored in turn.

### 1. Automobile Exception

A warrantless search and seizure of a vehicle is permitted when law enforcement officers have probable cause to believe the vehicle contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999). The officers may conduct a warrantless search of the vehicle and any containers found therein if there is probable cause to believe that contraband or evidence of a crime is secreted at some unknown location in the vehicle. *California v. Acevedo*, 500 U.S. 565, 594 (1991) (citations omitted); *United States v. Ross*, 456 U.S. 798, 824 (1982). Probable cause is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The Sixth Circuit defines probable cause as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). "Determining whether probable cause existed at the time of the search is a commonsense, practical question to be judged from the totality-of-the-circumstances . . . . In determining whether probable cause exists . . . we look to the objective facts known to the officers at the time of the search." *Smith v. Thornburg*, 136 F.3d 1070, 1074-75 (6th Cir. 1998) (internal quotation marks and citations omitted). Once an officer has probable cause to search a vehicle under the automobile exception, evidence found may be seized pursuant to the plain view doctrine. *Texas v. Brown*, 460 U.S. 730, 738 (1983). Here, the Government asserts there was probable cause to believe a search of the Jeep would reveal evidence of: (1) one or more drug-related crimes; and (2) the felon-in-possession-of-a-firearm crime.

### A. Drug-Related Crimes

Here, several facts established probable cause, as of the time of the search of the Jeep, that evidence of one or more drug crimes was located inside of the Jeep. Those facts include: the tip of the confidential informant who stated Defendant would be at the Big Wash Tub in a white Jeep with a large amount methamphetamine; the prior partial corroboration of the informant's information; Sergeant Ussery's and Special Agent Babiarz's observation of Defendant sitting inside the Jeep in the parking lot of the Big Wash Tub; the officers' reasonable belief that Defendant was dishonest when he stated he had not been in the Jeep; the methamphetamine, pipe, and Jeep key found during the search of Defendant's person incident to his arrest; and Defendant's outstanding drug-related warrant.[6] In view of the totality of circumstance, the Court finds probable cause existed to support a warrantless search of the Jeep. *See Ross*, 456 U.S. at 825 ("[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

Defendant argues the fact that Officer Hull's canine failed to alert on the Jeep negates probable cause and dispels information offered by the confidential informant. (Doc. No. 47 at 12). Defendant asserts that because the canine did not alert, the only two plausible conclusions are that the informant's tip was inaccurate or that the methamphetamine found on Defendant's person was the only drugs at the scene. (Doc. No. 47 at 11-12). In support of this argument, Defendant cites *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005). In *Davis*, law enforcement observed the defendant talking with a suspected drug dealer, as well as two large boxes of detergent sitting next

---

[6] The Court realizes that the existence of this warrant by itself does not necessarily mean either that Defendant was guilty of the crime underlying the warrant or, even if Defendant was, that evidence of more current drug-related activity would be found in the Jeep. However, the fact that a court (in issuing the warrant) previously found probable cause of Defendant's commission of drug-related crime tends to support the indication from the other facts that Defendant might be engaged currently in criminal drug activity.

to the defendant's car. 430 F.3d at 349. The boxes of detergent were similar to large detergent boxes found in the search of a building linked with the suspected drug dealer. *Id*. Furthermore, investigators previously found large amounts of cocaine in several other individuals' vehicles when they were stopped after a meeting with the suspected drug dealer. *Id*. at 349-50. In view of these circumstances, the Sixth Circuit held that the officers who pulled the defendant over for speeding acted legally when they detained him for forty-five minutes while a drug-sniffing canine could be brought to the scene in order to sniff the defendant's car for the presence of cocaine because they had probable cause to do so. *Id*. at 355. Once the canine failed to alert to the presence of any drugs, however, the court found it was a violation of the defendant's Fourth Amendment rights to make him wait an additional fifty minutes for a second canine to be summoned. *Id*. at 356-57.

Defendant argues that facts here are similar to *Davis*, so that the canine's failure to alert dispels any probable cause. The Court, however, finds *Davis* distinguishable for several reasons. First, *Davis* addressed reasonable suspicion for an investigative *Terry* stop, not probable cause for a search. Furthermore, and significantly, here, unlike *Davis*, other evidence gave rise to probable cause prior to the canine's failure to alert. *See United States v. Holloway*, No. 05-80659, 2006 WL 2946788, at *6 (E.D. Mich. Oct. 16, 2006) (finding *Davis* distinguishable because other evidence existed to give rise to probable cause to search the vehicle and holding that the defendant was not unreasonably detained during a traffic stop because "[t]he canine sniff [] was not as important as it was in *Davis*, so it was not unreasonable for the officers to continue searching Defendants' vehicle even after the dog failed to alert to any drugs in the trunk area."); *United States v. Jodoin*, 672 F.2d 232, 236 (1st Cir. 1982) (holding that a "dog's failure to react does not . . . destroy the 'probable cause' that would otherwise exist. It is just another element to be considered.").

11

The facts here are similar to *United States v. Williams*, 124 F. App'x 885 (5th Cir. 2005). In *Williams*, the court held that the failure of a canine to alert did not deprive law enforcement of probable cause to search the defendant's vehicle pursuant to the automobile exception to the warrant requirement because "[e]xamining the totality of the circumstances, including [the defendant's] behavior, his dishonest responses to questions regarding the car, information previously gathered from informants and information gathered by the officers during their on-site interviews, the officers had probable cause to search the vehicle prior to the arrival of the drug dog." 124 F. App'x at 887. Similarly, here, as discussed above, considering the totality of circumstances, the Court finds that probable cause existed to search the Jeep prior to the canine's arrival at the scene. *See United States v. Ramirez*, 342 F.3d 1210, 1213 (10th Cir. 2003) ("We will not require investigators to cease an otherwise reasonable investigation solely because a dog fails to alert, particularly when we have refused to require that a dog sniff test be conducted at all."). Therefore, the canine's failure to alert did not deprive the officers of the already-existing probable cause to search the Jeep for evidence of drug-related crimes.

### B. Felon-in-Possession-of-Firearm Crime

The Court finds the officers also had probable cause to believe the Jeep contained evidence of a felon-in-possession-of-a-firearm crime. Prior to the search, Defendant, when asked, informed Officer Hull that he was a felon. Further, Officer Hull observed a gun and ammunition in plain-view through the window of the Jeep,[7] in which Sergeant Ussery and Special Agent Babiarz observed Defendant sitting. Thus, there was probable cause to believe the Jeep contained evidence of the crime of felon in possession of a firearm.

---

[7] Officer Hull's observation was lawful. *See United States v. Weatherspoon*, 82 F.3d 697, 699 (6th Cir. 1996) (explaining that it is not unconstitutional for officers to look through the window of a vehicle) (citing *Brown*, 460 U.S. at 740)).

12

Defendant argues that because the Jeep did not belong to Defendant, the gun and ammunition in plain view did not give rise to probable cause, because law enforcement could not have known the gun and ammunition belonged to Defendant. Defendant contends that Sergeant Ussery "has never claimed to have recognized the man they accosted in the Big Tub as the same person they had seen in the Jeep" and, similarly, that the officers "didn't claim to know that the man they accosted in the Big [Wash] Tub [(*i.e.*, Defendant)] was the same person they had seen when they rolled by the Jeep five minutes earlier." (Doc. 47 at 6, 12). Thus, Defendant argues the Government cannot prove Defendant's constructive possession of the Jeep, meaning that the gun in plain view did not give rise to probable cause to search the Jeep for evidence of possession of a firearm by a convicted felon (*i.e.*, Defendant).

The Court cannot accept Defendant's argument. To begin with, although it is true that the officers never *expressly* claimed specifically that the man they accosted in the Big Tub as the same person they had seen in the Jeep, they never were asked at the suppression hearing either to embrace or reject such a claim. Certainly neither officer renounced any such claim, and as explained in footnote 3 above, the most reasonable construction of the evidence is that each officer *implicitly* was in fact making such a claim.

In any event, as the Government points out, whether the Government can prove constructive possession of the Jeep is not at issue. The issue is whether the firearm and ammunition in plain view, in a car (whether or not constructively possessed by Defendant) in which two officers had just observed Defendant, combined with Defendant's statement that he was a felon, gave rise to probable cause that the Jeep contained evidence of a felon in possession of a firearm crime. This question must be answered in the affirmative. *See United States v. Black*, No. 14-364, 2015 WL 13660478, at *2 (D. Minn. Apr. 10, 2015), *rev'd in part on other grounds*, 871 F.3d 590 (8th Cir.

13

2017) (explaining that law enforcement awareness of the defendant's status as a felon combined with a gun in plain-view "constituted sufficient probable cause to justify a search of the entire vehicle for evidence of a crime" per the automobile exception); *United States v. Madrid*, No. CR 08-683, 2009 WL 10658346, at *4 (D. N.M. Feb. 18, 2009) ("[The] Officer [] saw the rifle case in plain view and knew that Defendant was a felon. He therefore had probable cause to believe the rifle case contained evidence of the crime of felon-in-possession-of-a-firearm and could search the case under the automobile exception to the warrant requirement."). Regardless of whether Defendant constructively possessed the *Jeep*, there was probable cause to believe that Defendant, a felon, had been in possession of the *firearm* in the Jeep. Accordingly, there was also probable cause to search of the Jeep for evidence of a felon in possession of a firearm crime.

**2. Search of an Automobile Incident to Arrest**

Another exception to the warrant requirement exists when a search of an automobile is performed incident to the arrest of one of its occupants: The "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartments at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of the arrest." *Gant*, 556 U.S. at 351 (emphasis added).

Defendant argues that *Gant* "does not possibly apply" because Defendant was handcuffed and sitting in the back of a police car during the time of the search. Defendant is correct that one justification for the search incident to arrest is not available here. However, Defendant ignores the second justification for a search incident to arrest: that "it is reasonable to believe the vehicle contains evidence of the offense of the arrest." *Id.*

The Government contends that it is reasonable to believe that the Jeep contained offense-related evidence associated with Defendant's arrest (*i.e.*, evidence of criminal impersonation) and

14

with the search of his person incident to arrest (*i.e.*, evidence of drug possession). The Court agrees. First, as discussed in footnote 3 above, the evidence suggests that when encountering Defendant inside the Big Wash Tub, two officers identified Defendant as the male they had seen sitting in the Jeep, making him a known recent occupant of the Jeep. Defendant argues that Sergeant Ussery and Special Agent Babiarz could not possibly have known whether it was Defendant sitting in the Jeep, because neither knew what Defendant looked like before seeing him at the Big Wash Tub. However, as explained above in footnote 3, both officers testified that when they drove through the parking lot of the Big Wash Tub, they saw sitting in the Jeep an individual they subsequently were able to identify as Defendant, and the Court finds this testimony credible.[8] It is of no consequence that the officers did not know what Defendant looked like prior to their drive-by. What matters is that, according to the most reasonable construction of the evidence as explained in footnote 3 above, when these officers encountered Defendant inside the Big Wash Tub, they recognized him as the same person they saw inside the Jeep. Thus, the Court does not find Defendant's argument convincing.

Second, when Defendant was searched incident to arrest, a baggie containing 5.5 grams of methamphetamine and a pipe were found on his person. *See United States v. Swallows*, No. 1:12-CR-148, 2013 WL 5773261, at *5 (E.D. Tenn. Oct. 24, 2013) ("Finding illegal drugs on a person who has just exited a vehicle can provide probable cause to believe further evidence of a drug crime might be found in the vehicle." (citing *United States v. Johnson*, 383 F.3d 538, 545 (7th Cir. 2004))). Further, the informant told Officer Seagroves that Defendant would be in the Jeep with a "large amount of methamphetamine," and Sergeant Ussery knew there was a drug-related arrest

---

[8] Although the surveillance footage does not show Defendant exit the Jeep and enter the Big Wash Tub, the timeline of the surveillance footage supports that the officers arrived at the Big Wash Tub while Defendant was still sitting in the Jeep, thus enabling the officers to observe Defendant in the Jeep. (*See* Gov. Ex. 1a).

15

warrant for Defendant. Therefore, the officers could reasonably believe that the Jeep contained offense-related evidence relating to his real identity, as well as further drug-related evidence. *See United State v. Rogers*, 656 F.3d 1023, 1028 n.5 (9th Cir. 2011) (noting that the *Gant* standard "appears to require a level of suspicion less than probable cause."); *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010) ("Rather, the 'reasonable to believe' standard probable is akin to the 'reasonable suspicion' standard required to justify a *Terry* search."). Therefore, the Court finds that the search of the Jeep was a valid search incident to arrest.

In conclusion, the Court finds that the search of the Jeep was supported by two different exceptions to the warrant requirement: the automobile exception and search incident to arrest. Accordingly, the fruits of the search of the Jeep will not be suppressed.

### III. Defendant Validly Waived his *Miranda* Rights

The Fifth Amendment provides that a defendant in a criminal case cannot be compelled to be a witness against himself. Consistent with that right, in *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), the Supreme Court held "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." The *Miranda* rule is limited to "custodial interrogations," which the Supreme Court has defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). Any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *Miranda*, 384 U.S. at 444. Defendant contends that his statements made to Sergeant Adams about the drug dealer's sources, as well as the incriminating statements made at the Columbia Police Station, should be suppressed because his waiver was not voluntary or knowing.

1. **Waiver of Miranda Rights on the Scene**

Defendant argues that the Government improperly reinitiated its questioning of Defendant at the scene after he invoked his right to counsel and consequently, his statements made at the scene should be suppressed. (Doc. No. 30 at 6). "Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation until counsel has been made available to him." *McNeil v. Wisconsin*, 501 U.S. 171, 176-77 (1991). However, when a suspect approaches police on his or her own and reinitiates the conversation, law enforcement may pursue obtaining a waiver of the right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Hill v. Brigano*, 199 F.3d 833, 840 (6th Cir. 1999). The Sixth Circuit has determined that "initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *United States v. Whaley*, 13 F.3d 963, 966–67 (6th Cir. 1994) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1043 (1983)).

The applicable testimony at the hearing, which the Court finds credible, revealed that after Sergeant Adams read him his *Miranda* rights at the laundromat, Defendant requested a lawyer, thus invoking his right to counsel. Sergeant Adams immediately cut off the conversation. Shortly after, Defendant indicated he wished to speak to Sergeant Adams again. Sergeant Adams reminded Defendant that he invoked his *Miranda* rights, and Defendant informed Sergeant Adams that he was aware of that but nevertheless now desired to speak with him. Thereafter, Defendant revealed information to Sergeant Adams about key sources of drug dealers in the area. Sergeant Adams informed Defendant that because there was an outstanding warrant for Defendant's arrest, no information Defendant could offer would prevent him from going to jail that night. Defendant then stated that he had nothing further to say, but he did not again request a lawyer. Based on the testimony establishing these facts, the Court finds that Defendant waived his previously invoked

right to counsel when he approached law enforcement and expressed a desire to discuss his case with law enforcement, even after he was reminded that he had invoked his *Miranda* rights. *See Whaley*, 13 F.3d at 966–67. Therefore, the statements made to Sergeant Adams at the laundromat, and statements made at the Columbia Police Station, will not be suppressed as obtained in violation of his Fifth Amendment right to counsel under *Miranda*.

### 2. Waiver of *Miranda* Rights at the Police Station

In Defendant's post-hearing brief, Defendant asserts, for the first time, that the Court should suppress his statements made at the police station during the custodial interview because he did not explicitly waive his *Miranda* rights and the form he signed did not include an overt waiver of those rights. (Doc. No. 47 at 13-14).

Defendant's argument misses the mark because an express waiver is not the only means by which a suspect can waive his or her *Miranda* rights. Suspects can also waive their rights implicitly. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979). To expressly waive *Miranda* rights, the suspect must state, or sign something stating, that he or she waives their rights. *Id*. To implicitly waive their rights, the suspect must behave in a way that indicates a knowing and voluntary waiver of *Miranda* rights. *Id*. A defendant may implicitly waive the rights conveyed in *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 475. The inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Here, the Court finds that Defendant knowingly and intelligently waived his Fifth Amendment rights prior to the custodial interrogation. Defendant points to no evidence to suggest his waiver was not made with a full understanding of his rights. On the other hand, the final clause of the Admonition of Miranda Warnings form provided by the Columbia Police Department, which Defendant signed, states, "I have read this statement of my rights and I fully understand my rights. No promises, threats, pressure or coercion of any kind has been used against me." (Def. Ex. 12). Further, prior to questioning Defendant, an officer read the Admonition of Miranda Warnings Form out loud to Defendant. Defendant orally confirmed that he understood those rights and initialed the form after each separate right was read to him. (Gov. Ex. 1b). As discussed above, the law does not require Defendant to state his waiver of rights explicitly, provided that the waiver was made knowingly, voluntarily, and intelligently. *See Bachynski v. Stewart*, 813 F.3d 241, 249 (6th Cir. 2015) (explaining that the defendant's waiver of her right to counsel was valid when "[b]efore any 'interrogation' took place, [the defendant] reviewed her rights . . . both orally and on paper. [The defendant] said she understood all of them, and she signed a document to that effect. She did not have any questions or appear to misunderstand what was happening."). These actions support that Defendant implicitly waived his *Miranda* rights before he made self-incriminating statements at the Columbia Police Station. The Court does not dispute that an express waiver, with written or oral or both, might be better practice and would place the Government in an even better position to establish waiver. However, the implicit waiver in this case suffices to carry the day for the Government.

Further, the Court finds inapposite Defendant's reliance on *McDonald v. Lucas*, 677 F.2d 518, 521 (5th Cir. 1982). Defendant cites *McDonald* for the proposition that it "is not the law" that "[i]f the accused understands his rights, is not threatened, is not physically harmed, and speaks, he

19

is no longer entitled to his constitutional safeguards." 677 F.2d at 521. In *McDonald*, the Court held that that the defendant did not waive his *Miranda* rights because there was "no evidence of words or actions implying a waiver[.]" *Id*. at 521-22. A critical difference between *McDonald* and the case at hand is that the defendant in *McDonald* refused to sign a *Miranda* waiver form and the court found no other actions that implied a waiver. *Id*. at 521. Here, Defendant voluntarily signed the form acknowledging he had been read and understood his rights, and subsequently voluntarily answered law enforcement's questions. (*See* Gov. Ex. 1b; Def. Ex. 12).

Accordingly, there is no basis to hold that Defendant's waiver of rights prior to the custodial interrogation was not a knowing or voluntary one. Defendant's statements made during his custodial interrogation at the police station are not suppressible as obtained in violation of *Miranda*.

## CONCLUSION

For the foregoing reasons, the Court holds Defendant's arrest was supported by probable cause, the warrantless search of the Jeep was lawful, and Defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. Therefore, Defendant's Motion to Suppress (Doc. No. 30) will be denied.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE